This is the first time I've been here, and I'm excited to show you around.  Now, thank you, Your Honor. Chief Judge Rader, may it please the Court. Both parties in this case agree on two key things. One, the lower court got the relevant parcel issue wrong. And secondly, and even more importantly, facts matter in a takings case. And they matter in this case as much as in any case, because we had a trial in this case. What matters? Facts. And factual findings by the trial court. We had a trial in this case specifically to determine the specific issue that sent the case to trial and led Judge Leto to deny cross motions for summary parcel issue was to determine factually whether there was a link between the development of Platte 57 and the prior development of the rest of the Johns Island community. And he found as a fact that there was no such link. And there are multiple, multiple reasons of that. The development of the community was completed in 1994, and there are numerous subsidiary findings of fact that are quoted and cited on page 46, 47 of our brief. Very detailed findings of fact that support his finding that the development of the community was completed in 1994. That's a fact. The government likes to show us the 1980 plan and the 1968 plan, which developed all of the Jim Island and John Island together. And they like to see that as the partial. There was no 1968 plan, Your Honor, that's mentioned by them or in the record. There was a contract, an option agreement in 1968. There was a 1980 plan. Judge Leto addressed it very specifically. The plan was denied, right? Pardon me? It was denied. There was not accepted. Your Honor, there was not a plan in 1968. In 1980. In 1980, there was a plan. Yes. And it was submitted in connection with some permits. Excuse me, I'm sorry if I misspoke. It was submitted. It was modified. It was not followed. It was addressed specifically by Judge Leto, and he found that it did not support the basic point here that the government is trying to make, which is that Platt 57 was part of that plan. Okay? That's all addressed in his opinion. He found as a fact. Now, do you accept that Platt 55 belongs with Platt 57? Your Honor, if I may, just one more point on the opening point. He found as a fact that the development of the community was completed in 1994. That's a fact. He also found as a fact that Lostree did not even think to develop Platt 57 until 2002. It was ignored. Lostree happened upon Platt 57 by happenstance. A neighbor was improving a mosquito impoundment in the Indian River, and Lostree got a letter. This is all in the record. Lostree got a letter about that. They realized they could get some mitigation credits for that. That was the first time they ever thought to develop Platt 57. That's a fact. It's found as a fact. Their first thought was, well, we're done at John's Island. We're out of the development business. We're done. We have no development business left, which is all true, and Judge Gueto found. The first thought was, we'll put the credits in a mitigation bank. Then the state agency, the St. John's River Water Management District said, well, mitigation banks are complicated. See if you can go find a property where you can use these mitigation credits. They went out, and lo and behold, Platt 57. That was the first time Lostree ever thought to develop Platt 57. That's what we went to trial on. Those are facts. There are detailed findings. There's detailed testimony. Now, the judge concluded that it was not part of the prior development. Platt 57 was not. To your question, Judge Rader, what about Platt 55? Yes, but the judge does put it together with Platt 55 and thereby cuts back on that. It does not put it together with Platt 55 for this reason. Platt 55 is part of that prior development. In 1995, it was brought up to when Stingray Point, and there's a good map. I realize I'm very familiar with the property. There's a good map in the government's brief on page 8 that I refer you to. There are maps also in the appendix. But the Stingray Point, which is where Platt 57, and I think it may be helpful in answering your question about Platt 55, your honor. Stingray Point was all There are six lots there. Platt 55 was brought up to grade. Utilities were stubbed out to Platt 55 just as they were to the other six lots, and it was developed in 1985. So, this finding that Platt 55... The trial court links it to 55 via this 323-foot connector. Who owns that? Okay. There is no land on that 323 feet, which he found in his opinion, and we specifically referenced this in our brief. Excuse me for one second, because it's an important... This is a wetland, is it, or a marsh? Yeah, page 16, and note 1. This strip, there is a road and a right-of-way on that strip. The right-of-way is long ago dedicated to the homeowners association. Beyond the right-of-way is marsh and water, according to Judge Leto's findings. So, I believe that Lost Tree owns the marsh and water, but it's certainly not usable. And if you look at this map, I think it's very handy here on page 8 of the government's brief, you can see that there is a separation between Platt 55 and Platt 57. So, the finding or his assertion that they're contiguous is wrong. Where is the separation? I'm looking at the map. I don't... Page 8? I'm looking at page 8. Okay, you look at Platt 55, there's a black line around it, and you look at proposed Platt 57, and there's a dotted line around it, and in between there is 323 feet, which is also stipulated. But that's... You own that. Well, that's what we were just talking about. There's a right-of-way that the homeowners association owns. Beyond the right-of-way, according to his opinion and facts that support it, and page 16 and note 1 of our brief, there's marsh and water. And we do own the marsh and water. You own the marsh and water. Oh, this was all... Listen, we bought all this land together. Bought it all together. And by the way, we bought it together, all of 1,300 acres that are on this page, which is the community of John's Island. By the way, we bought it together with 1,400 other acres that are outside of this picture, that are on islands and elsewhere. McCullers Point? McCullers Point, we own half of. There's 1,400 other acres that are not part of this community. The rest of it, that's part of the parcel as a whole. Why? Because they weren't developed together. And so what I want to come back to is the part... There are lots of factors and inflections. Wasn't the decision made not to develop Platte 57 at one point? It's kind of like we've done enough, we have enough, a lot of that's marsh land, and we're not going to develop that. Your Honor, no such decision was made. There's nothing in the record that supports that. But it never was developed. It was never even stubbed out. It was ignored. That's Judge Leto's word. It was ignored. Well, same thing. It was ignored, not developed. Well, it was excluded from the development of this Stingray Point. They didn't stub out the utilities. They excluded it. And if you look at... There's another point, which is... When I look at Platte 55, it was never developed, but it was stubbed out. It was developed. It was brought up to grade and stubbed out. It was not sold. We do own it. We do own it. Well, I guess what I mean by developed, I mean, eventually it was not sold. It was not sold. But it was stubbed out and plans... You look at the record and you see that the plans were being made to perhaps develop it and for whatever business reason to sell it. And whatever business reasons there were, LT decided not to complete the project. That is correct. They didn't sell it. They completed the project. They just didn't sell it, Your Honor, if I may. It was all done. Okay. So we do own it. Platte 57, none of that happened. It was ignored. That's correct. It was not a decision to... I mean, maybe we're quibbling over a real fine point there, but it was ignored. That was his finding. Did you at any point treat Parcel 55 as the same as the proposed Platte 57? I don't think so, Your Honor. It doesn't contain wetlands. That's part of the analysis we make to see the parcel, whether you treated them as the same, right? Treated them as the same. Well, let's get to Judge Leto's rationale. First, because I think he did... His reasons for including it are not convincing. First of all, he found that it wasn't just 55 and 57, but also a handful of other scattered wetlands around the community. That was his finding about the relevant parcel, but government doesn't even try to defend that. He found, as I said, that there was a separation between the 94 completion of the community and the 2002 first... And the Platte 55 was completed in 94, right? 85. 85 is when... So you treated it rather differently than you treated... We treated it differently. His conclusion, his primary conclusion that the development of Platte 57 was separated from the prior development of the community means that it was also separated from the prior development of Platte 55. It's fundamentally inconsistent, I think is the phrase that I used in the brief. You can't say it's separated from the prior development of the community and say it is not separated from 55 because 55 was part of the prior development. Okay. The government doesn't even mention... Judge Leto did a very good job on separating it from the community, but frankly, I think a much less good job on explaining why Platte 55 should be included. The government, he had some legal reasons. Government doesn't even mention, doesn't even mention Judge Leto's legal reasons for including Platte 55, and we went through that in our brief, I think it's 48 to 54. There was a footnote in Lucas where Justice Scalia criticized, and the court, for the court, criticized the New York Court of Appeals in the Penn Central case for taking account of other property in Manhattan that Penn Central owned. They don't mention that. There's no convincing factual reason to include it either. As we've just been through, it's not consistent with the primary finding that 57 was temporarily, if you will, separated from the prior development. It's not contiguous because of the 323 feet, which was stipulated on A-77 and 78, was stipulated that Platte 55 is 323 feet away from Platte 57. These are the four factors, by the way, that the government cites as being relevant to parcel as a whole on page 30 of their brief. Contiguous? No. Developed together? No. Cross-enhancement? I'm not sure what that means when you're talking about, would it be enhanced if they built a house on 57, or would it be enhanced if they left it? The golf course enhances the rest of the community. They were purchased together. Yes, they were purchased together as part of the overall purchase in 1968. Let's turn a little bit to this diminution in value calculation. Where is the residual value based on the holding that it can't be developed? If we're talking about the residual value of Platte 55? Yes. It's 25, according to our appraiser, $25,000, which is 0.6% of that appraiser's, of our appraiser's estimated fair market value if it had been developed. What's the source of the 58% number? Oh, 58% number is based on the as a whole, the holding below on the relevant parcel issue by Judge Leto was that the relevant parcel is Platte 57, Platte 55, and a handful, I can't remember, 5, 6, of other scatterings. He took all of that property and he said there was evidence that that was worth, I think, maybe around $10 million, all of those together. The denial of the $4.8 million of Platte 57, or maybe it was $8 million, the denial of Platte 57 was only 58.6% of the value of all of those properties that he included in the relevant parcel. Okay. But, wasn't part of the denial that there was a deal that had been struck that if the enforcers head permit was to be approved that, what is it, Platte 57 would not be filled in? It would be dedicated to wetlands? I don't believe the record supports any such deal. There was testimony from Ms. Sadowski, of course, project manager, that she heard Judge, she heard one of Lost Tree's consultants. She thought he had promised that. He denied it on the witness stand. I don't believe the judge made any findings about it, but in terms of any kind of a deal, I mean, I think it was a misunderstanding, is my recollection of the record on that. Can we save the rest of your time? Thank you, Your Honor. One last point before I... Certainly. And that is, on the purchase together, that can't be dispositive here either. They admit that they would have, and there was a finding, that they would have granted the permit to another landowner. And, let me sit down and just take it for a moment. I'm sorry, Your Honor. Mr. Littleton. Good morning, Your Honor. May it please the Court. I'd like to start with the Platte 55 issue, and I direct the Court first to page 823 of the appendix. What's the government's justification for their agreement that if these properties, if these areas, were owned by different owners, rather than the same, that they would have come out differently? Your Honor, that's another point that I will... I would direct the Court to pages A339 and 340 of the record, where you see Ms. Sadowsky's testimony in full about that. Ms. Sadowsky testified specifically with respect to that, that it would not have made a difference if another owner in Lost Tree's position had applied for the permit. So that statement by the trial court is simply not supported by the permit. And is that the government's position as well? The government's position is that the court's analysis, as Ms. Sadowsky plainly stated, is that it would not have made a difference. So the value of an owner's property really is out of that person's control, depending on what happens next door to some other piece of property. I'm sorry, Your Honor. I'm not sure I understand. I'm trying to understand the basis for putting it all together. For putting the parcel together? If it were not together, then according to this, then nonetheless, the engineers, the Corps of Engineers in the United States, could put them together in their head in order to come up with a different valuation for a particular person's property. Your Honor, the Corps of Engineers dealt only with Plat 57, because that was the only proposed area for them. That's correct. And the Corps' analysis, which, by the way, this court cannot collaterally review the Corps' analysis and to take this case, but the Corps' analysis, as we explained in our brief, is supported by the record and does not support the contention of Lost Tree and the trial court, that Lost Tree was singled out specifically. Now, you never proposed or favored adding 55 to Plat 57, right? Well, we proposed the entire community. Yeah, I understand that. You lost on that, so that's out of the game. How does this 55 get added? That looks almost like somebody's adding it to make sure you get below the 75% Florida rock number. Your Honor, I would argue that at a minimum, Plat 55 needs to be... How? It's not part of... It was all done in 85. There's nothing that's really relevant. In fact, it's called temporally separated and it's a different ball of wax completely, isn't it? So, the first thing I would start with on Plat 55, Your Honor, and again, I would get back to this point, page 823 of the record. You see the trial court's findings at the first full paragraph on the second column of that page, which is Plat 55 and Plat 57 are... Two separate parcels. Two separate parcels recorded at different times with a 323-foot strip of land lying between them. However, Lost Tree owned at the time of the permit application and owns at the present time that 323-foot strip of land. Now, what Lost Tree argues in its reply brief is that the trial court's finding on page A11 in footnote 14 is to the contrary. And I would direct the court to that finding as well, which begins at the top of the second column. You see the end of the paragraph beginning, Plat 55 was recorded. The last two sentences of that paragraph, a 323-foot, again, strip of land lies between Plat 55 and Plat 57. That strip consists of a shoulder, which drops to water and marsh. And then you look at footnote 14, where there's testimony from Mr. Melchiore, Lost Tree's representative. Where are you reading again? This is page A11, footnote 14, which is midway down the second paragraph. And you see the testimony which says, from Mr. Melchiore, you could not put a sidewalk on the right-of-way, which is an easement. Lost Tree owns that property in fee. There is an easement granted to the property owners association. But Lost Tree owns the entire strip of land that you see on page 8 of our brief in between Plat 55 and Plat 57. What's that relevant to at all? It's relevant, Your Honor, because... Because 55 was done in 85. It was treated separately. It was considered separately. It was contiguous. 55 is not contiguous to 57, because even that requires you to find this connecting strip, which is contested. How do we get 55 and 57? This is just manufactured, isn't it? Your Honor, I would turn that around. You didn't favor that, did you? We favored a much broader parcel. Yeah, you didn't even see it this way, so you don't even have to defend this, right? Well, Your Honor, I would say that, first of all, Plat 55 was not done in 1985. It was not recorded until 1998. Which is still four years before anybody's dreaming about Plat 57. Your Honor, it was, well, 2001 was the year in which Plat 57 arguably came about. But I think there's still a distinction in time, place, method of dealing with them. They're treated separately, which is what we're supposed to look at. I would direct the Court also to page A129 of the record, where you see Mr. Byer's testimony, the president of Lost Tree, who said at the top of page 136 of the trial transcript, he's talking here about Plat 55. He says, by the time, even though this thing was platted in 96 and recorded in 97 and 98, I don't think it was even listed for sale until many, many years after that. Now, what is many, many years after 1998? Why does that make a difference? It makes a difference, because if you look at what distinguishes Plat 55 and Plat 57, it is solely the fact that Lost Tree decided it wanted to divide up its particular segments of property into different plats that don't contain, that have a piece in the middle that Lost Tree still owns. That's not in dispute, but why does it make a difference? Why does it make, why does, I'm sorry, why does what make a difference? I hear you telling us that if they had developed everything all at once within the same few months or few years, that the result would be different, and the fact that this is being done piecemeal, it somehow is adverse to their position. Your Honor, this is what developers do. They start with the low-hanging fruit. I see. They develop the upland properties first, and they start with the upland properties, and Plat 55, the only difference, it's filled in, and so they stubbed out utilities to it. They couldn't stub out utilities to Plat 57 because it's a wetland. There was no place to put those utility pipes. What Lost Tree's rule would suggest is that everybody gets one taking, because you start out with a low-hanging fruit. You have this huge development, and you say, well, I'm going to get the easy stuff, the stuff that I don't need to get permits for. And then, lo and behold, at the very end, you're down to the one last parcel. And you say, well, there's a categorical taking, because there's nothing else left. And that simply can't be the one. We're not talking about a categorical taking here. We're talking about a regulatory taking. We're under Penn Central, and we're looking for the parcel, and the test we use is whether they were treated the same, and whether the economic expectations of the owner was the same. 85, they're done with Parcel 5. They record it later. But the economic expectations are done with that years before Parcel 57 even comes into consideration. Well, Your Honor, the only thing that was done in 1985 was that utilities were stubbed out to a filled parcel. The reason that utilities weren't stubbed out to Plat 57 is that it wasn't filled at that time. We'll get back to Forest Park. Were they treating them the same? Your Honor, they weren't... Were they considering them the same? Your Honor... Were they offering them for sale? They were offering neither for sale, Your Honor. When did they go to the state and ask for the permits on Parcel, on Plat 57? On Plat 57, they went in, I believe it was 2001, 2002. I can't remember the exact year. Yeah, it was after 2002 sometime. And when did they do all of that with Parcel 55? Through the state permits? Yeah, when did they get all the permits to put in all that material? It was before 1980, right? Well, Your Honor, I don't know that there's evidence of the record as to particular permits. But they would have had to have permits to put in all of that sewer and other material from the state, right? I suppose they would, Your Honor. But I think... Now we're talking about, for real development purposes, a 30-year difference. Your Honor, I would say this. If you look at the overall context in which Lost Tree purchased this property and looked at what it meant to do with the property, the question here is not development, quote-unquote. What were the expectations back in 1980? The expectations, Your Honor, with respect to Plat 57 were to leave it as, according to the 1980 development plan, were to leave it as a wildlife preserve. And that enhanced the value of the surrounding communities as Lost Tree's advertising stresses and as the neighboring property owners clearly thought as well. And I think that what you see between Plat 55 and Plat 57, we don't assign any particular significance to Plat 55. All we're saying is that, at a minimum, the parcel as a whole rule is dead if Plat 55 and Plat 57 can be considered together. Because what you're essentially saying is that you start out with the easy stuff. You develop that first. And then you're left with a very small piece of your original property. And yet you get to recover as though it were the initial piece of property. And I'd like to turn now to the diminished value point for a minute, which is that regardless of what this court holds as the parcel as a whole, even if it were to say that the trial court erred and that only if this court were to say that Plat 57 alone was the parcel as a whole, you still get to the point that Lost Tree has not demonstrated any diminution in value between the time before the court denied the permit and the time after. They presented no evidence. And they bear the burden to present that evidence, as this court said in Forest Properties. The only evidence they presented was that the hypothetical value had the permit been granted. And I would encourage the court to look to the last page of Forest Properties, where the court goes through this extensively. And in that case, again, you had the property owner presenting evidence of hypothetical lost profits. And the Forest Properties court said, no, that's not enough. That's different than Love Ladies and different than Lucas, the two cases that Lost Tree relies on most heavily, where there were categorical takings. In Lucas, the property owner paid a million dollars and was left with a valueless property. In Love Ladies, the trial court made an explicit finding that before the alleged taking occurred, the fair market value was several million dollars, and it was left valueless afterwards. There was no similar finding in Forest Properties, and there's no similar finding in this case. So whatever the parcel as a whole, Lost Tree has not carried its burden to demonstrate diminished value. And so there is no taking categorical otherwise for that reason alone. Your Honor, I would also go back and just list off the things that connect not only Plat 55 and Plat 57, but also the rest of the Johns Island community, which is the security gates that bound that community make it one cohesive whole. The infrastructure that Lost Tree laid for the entire community, there's a road, Stingery Point Road, that runs right by Plat 57. The water service, the utility service, yes, that service hasn't been stubbed out to Plat 57 now, but surely if Plat 57 was filled, that utility service would be stubbed out there and would serve the exact same purpose as it's now serving in Plat 55. So there's an artificial distinction, Your Honor, between these two properties, as well as between these two and the rest of the surrounding properties, that simply would vitiate the parcel as a whole rule. And I would strongly encourage this court not to adopt the trial court's reasoning on that point, but to certainly at a minimum say that Plat 55 and Plat 57 alone are the parcel as a whole, which under the trial court's analysis and the trial court's numbers would put you well out of the Lucas taking it into the Penn Central analysis. We win on the Penn Central analysis for reasons explained in our brief. And even if you decide against us on the parcel as a whole question, there's the diminution in value problem that Lost Tree has clearly not carried its burden to demonstrate. If there are no further questions, Your Honor. Thank you, Mr. Littleton. Yes, thank you, Your Honor. On the unequal treatment point, Judge Leto found as a fact from the testimony that Ms. Sadowski testified that the permit would have been granted, and that's on page A15, and it was based on her testimony on A339, which was her deposition. I took her deposition. I heard her say, and the transcript reflects, that it would have made a difference. Then there were some other questions, slightly different phrasing, and she backtracked on that at the deposition. Judge Leto observed her on the witness stand. He saw that first answer that it would have made a difference. He saw her squirming the way she did at the deposition when the questions changed. Yes, there is a later answer that says no, but he made a finding of facts. Does your piecemeal treatment of the property give you some kind of one-taking rule windfall? Right. Your Honor, that is a problem that was mentioned in Love Ladies. The government argued it there. They argue it a lot. The facts here don't support that. That's the whole origin of the flexible approach. There's a footnote in our brief that talks about that coming up in Love Ladies, but they still made a fairly bright line rule. This court did a fairly bright line rule excluding the prior property, because in that case also there was no evidence of shenanigans, if you will. That's a different case. That may be something that needs to be addressed in an opinion to make sure that people don't abuse things. Lost Tree did not abuse anything here. They ignored it. Why didn't you challenge a court decision under the APA? Because standard is very challenging, Your Honor. We considered it. So, but don't you concede the problem by not challenging it? Yeah. Denial stands. Denial is valid in the APA sense. On the point, the purchase together, as I was saying when I was sitting down, the purchase together can't be dispositive, because the land in Love Ladies and Palm Beach that was excluded was purchased together with the ultimate relevant parcel. Plat 55 was not just stubbed out in 1985. It was brought up to grade. That's in the record and it's mentioned in our brief. The wildlife preserve designation was for mitigation for a permit. That designation was withdrawn. That's covered in our brief and mentioned in the facts. And there was no intent to keep Plat 57 pristine. It was ignored. That was all batted about at trial and evidence was given on that. Thank you very much. Thank you, Your Honor.